McGregor *v.* Comstock.

[New-York General Term, October 3, 1853. *Edmonds, Edwards, Mitchell, Roosevelt* and *Morris,* Justices.]

---

McGregor and others *vs.* Comstock.

Estates forfeited to the state by acts of attainder passed previous to the treaty of peace with Great Britain of Sept. 3, 1783, were not divested from the state and revested in the former owners, by that treaty.

The article of the treaty, respecting confiscated estates, embraced only future confiscations, and had no reference to attainders and forfeitures which had already become complete and absolute.

A defendant, in ejectment, cannot move for a nonsuit on the ground of a want

McGregor *v.* Comstock.

of actual seisin in a person through whom the plaintiff claims, and who had a seisin in deed; where he does not found his objection on a descent cast

It is only in the latter point of view that an objection to the plaintiff's right of recovery can be taken advantage of by way of nonsuit.

In order to make a *fine* of any avail at all, the parties must have some interest or estate in the lands to be affected by it. The person levying it must have a freehold, either by right or by wrong. And in order to create a freehold by wrong there must be a disseisin.

In order to constitute a disseisin of the rightful owner, sufficient to authorize the levying of a fine by the disseisor, there need not be an expulsion of the rightful owner by violence.

When there is no violence, and when, from the circumstances of the case there can be none, the law will infer a disseisin from such other acts as show that the possession is adverse and hostile to that of the true owner.

Where it appeared in an action of ejectment, that W. had claimed title to the premises, adverse to that of the true owner, for some years prior to the levying of a fine by W., and had supposed that he had a good title; that he had been regarded by others as the owner, and had been taxed and assessed as such, and had paid the taxes and assessments; that the lot had been enclosed by a fence, probably built by him; and he had the actual and exclusive possession at the time the fine was levied; *Held* that these were acts which the law would regard as equivalent, in their effects, to an actual expulsion of the rightful owner by violence; and that they established such a freehold, by disseisin, in W. as would sustain the fine levied by him. EDMONDS, J. dissented.

MOTION for judgment, upon a special verdict. The action was brought to recover the possession of land situated in the city of New-York, of which each of the seven plaintiffs claimed to be entitled to one-seventh in fee. Plea the general issue. The cause was tried at the New-York circuit in March, 1851, before Justice Edwards. The jury brought in a special verdict, by which they found the following facts :

That Isaac Stoutenburgh and Philip Van Cortlandt, commissioners duly appointed, under and by virtue of the act of the legislature of the state of New-York, entitled "An act for the speedy sale of the confiscated and forfeited estates within this state, and for other purposes therein mentioned," passed May 19, 1784, for the southern district, by their deed, in consideration of * * * * did grant to William Boyd, his heirs and assigns, "All that certain piece or parcel of land situate, lying and being in the out ward of the city of New-York, and is a part of the

estate late the property of James DeLancey, Esq. and particularly described in a certain map or chart of the said estate, made by Evert Bancker, by lots numbers 1235 to 1241 inclusive; bounded southerly by Rivington-street, westerly by Orchard-street, northerly by land of Peter Stuyvezandt, and easterly by Sixth-street, containing seven lots. Also one other piece of land, situate as aforesaid, known and distinguished by lots Nos. 1397 to 1407 inclusive, bounded southerly by Rivington-street, westerly by lots No. 1389 to 1396 inclusive, northerly by land of Peter Stuyvezandt aforesaid, and easterly by Essex-street, containing eleven lots. Forfeited to the people of the said state by the attainder of the said James DeLancey." That the said William Boyd, by virtue of the said deed, entered upon the said premises and became seised thereof in fee simple. That on the 13th day of April, 1795, the said William Boyd, being still seised of the said premises, granted to William Rhodes and John McGregor, their heirs and assigns by deed, in consideration of —————— " All and singular those certain lots of grounds, situate, lying and being in the seventh ward of the city of New-York, and known and distinguished on a certain map or chart, made by Evert Bancker, of the estate, late the property of James DeLancey, by lots 1397, 1398, 1399, 1400 and 1401, bounded easterly by Essex-street, southerly by lot 1402, westerly by lots 1395, 1396, and other ground, and northerly by the ground of Peter Stuyvesant." That the said William Rhodes and John McGregor entered upon the said last described premises and became seised thereof, by virtue of the said deed, in fee simple. That the said William Rhodes being seised as aforesaid on the 10th day of July, 1800, by deed, in consideration of ————— granted to the said John McGregor, his heirs and assigns, one full and equal moiety and undivided half part of all and singular those certain lots of grounds, situate, lying and being in the 7th ward of the city of New York, and known and distinguished on a certain map or chart, made by Evert Bancker, of the estate, late the property of James DeLancey, by lots 1397, 1398, 1399, 1400 and 1401, bounded easterly by Essex-street, southerly by lot 1402, westerly by lots 1395, 1396, and other ground, and north-

erly by the ground of Peter Stuyvesant." That the said John McGregor, by virtue of said deed, entered upon the said last described premises and became seised thereof in fee simple. That the said John McGregor died seised of said premises, in July, 1802. That John McGregor left one child, him surviving, of the age of two years, called John McGregor the younger, his heir at law. That John McGregor the younger, upon the death of John McGregor, entered upon the said premises whereof John McGregor died seised, and became seised thereof in fee simple. That John McGregor the younger died in 1826, seised of said premises, leaving William McGregor his eldest uncle him surviving, his heir at law. That William McGregor entered upon the said premises last described, upon the death of John McGregor the younger, and became seised thereof in fee simple. That William McGregor died in 1833, leaving the plaintiffs, John, Ann, William, Charlotte, Elizabeth, James and Alexander, his heirs at law. That the defendant, when this suit was commenced, May 20, 1844, was in possession of part of lot 1397 of DeLancey's estate, as laid down in Bancker's map, to wit, the rear room in the second story, and the front room in the attic story, of the brick house on the south part of the said lot, and the right of passage through the yard from the shed in front of the house to the said second story and attic story. That Peter Stuyvesant's farm referred to in the deed of the commissioners of forfeitures, and in Bancker's map, was enclosed in a fence adjoining the premises in question, from 1785 to the death of Peter Stuyvesant in 1814. That Peter Stuyvesant died in 1814 seised in fee simple of said farm. That by an act of the legislature of the state, entitled " An act for the relief of the devisees of Peter Stuyvesant," passed April 16, 1816, Peter A. Jay and Cornelius J. Bogart were appointed commissioners to make partition of the real estate of the said Peter Stuyvesant among the persons entitled thereto. That in 1817, and prior to August 20 of that year, the mayor, aldermen and commonalty of the city of New-York, in order to levy taxes and assessments upon the lands lying adjacent to Essex and Stanton ———— and Ludlow streets, caused a map of the lands or lots of land lying upon Essex-street

McGregor v. Comstock.

to be made.   That on such corporation map all the lots of ground lying upon Essex-street, and for the said purpose laid down as 25 feet front on Essex-street and extending half way to Ludlow-street, formerly called Sixth-street.   That in order to make the ground included in Lot No. 1397, and the adjacent ground of the farm then late of Peter Stuyvesant into lots agreeing in size with the other lots adjacent and in the vicinity, 25 feet of the lot No. 1397 in Essex-street, and the ground in rear thereof between Essex and half way across to Ludlow-street, are put down on said corporation map and called lot No. 1553 of the ward number, of the tenth ward of the said city, and 18 feet and. eight inches of the said lot No. 1397, on Essex-street, and six feet four inches of the ground of said Stuyvesant farm on Essex-street, and the ground of the said part on Essex, half way through to Ludlow-street, are put down on said corporation map and called lot No. 1552 of said ward of said city.   That on the 20th day of August, 1817, Peter A. Jay and Cornelius Bogart, by their deed of partition among the devisees of Peter Stuyvesant, assigned to Margaret Stuyvesant, a daughter of Peter Stuyvesant, that part of the said farm of Peter Stuyvesant, lying adjacent to lots No. 1397 and 1398 of DeLancey's farm, as the same are laid down on Bancker's map.   That the partition deed of Jay and Bogart, described the part of the said farm assigned to Margaret Stuyvesant, adjacent to the said lots No. 1397 and 1398, as lot No. 97 of said partition, and by the map annexed to the partition deed, as well as by the description of lot No. 97, the said lot No. 97, included the said lots called by ward numbers 1552 and 1553.   That the description is as follows : " And also all that certain lot or parcel of land, which in the said map is designated by the letter S and the number 97, and which is bounded as follows, to wit : beginning at a point on the westerly side of Essex-street, distant 75 feet from the southwesterly corner of Stanton and Essex-streets ; thence running southwardly along Essex-street 75 feet ; then westwardly on a line parallel to Stanton-street, one-half of the distance between Essex and Ludlow-streets ; then northerly on a line parallel with Essex-street 75 feet ; thence eastwardly on a line parallel with Stanton-

street, to the place of beginning." A section of the map annexed to the said partition deed was annexed, and marked Schedule B. That the lands on which partition was awarded to be made by said act appointing Peter A. Jay and Cornelius Bogart as commissioners, being the lands whereof the said Peter Stuyvesant died seised, did not include any part of lot No. 1397, of DeLancey's farm, as laid down on Bancker's map, and did not include a triangle at the southeast corner of lot No. 97, 43 feet and 8 inches long on Essex-street, 77 feet long adjoining lot No. 1398, and on the third side of the triangle 93 feet long. That said partition deed of Jay and Bogart, omits to include by map or by description of any lot, the small triangle in rear of lot No. 1398, and which small triangle has always remained in possession of the devisee of Peter Stuyvesant. That in order to make the map marked Schedule B, a correct representation of the boundary line between Peter Stuyvesant's farm and DeLancey's estate, the line running diagonally across said map and marking the boundary between the Stuyvesant and DeLancey estates should have continued without interruption from the center of Essex-street to the center of Ludlow-street, leaving lot No. 1397 of DeLancey's estate south of said line, and the description in said partition deed should have been varied accordingly. That lot No. 1397 of DeLancey's estate when granted by the commissioners of forfeitures to William Boyd was a vacant lot, and so remained till after June 2d, 1827. That the said lots known by said ward numbers 1552, 1553, in said corporation map were assessed for taxes in 1818, 1819, 1820, to unknown owners, and the said taxes paid by Margaret Stuyvesant. In 1821, 1822, 1823, 1824 and 1825, the said lots were assessed for taxes and assessments, to, and the taxes paid by Margaret Stuyvesant, and in 1826 the said lots were assessed to E. L. Winthrop, and the tax paid by him. That Margaret Stuyvesant died in 1824, and by her last will and testament, and under the general words of the residuary clause, devised lot No. 97 of said portion to Egerton Lee Winthrop, known as E. L. Winthrop. That prior to June 2d, 1827, E. L. Winthrop employed Peter A. Jay, attorney and counselor at law, to levy a fine of " all that certain piece or

McGregor v. Comstock.

parcel of land, situate, lying and being in the 11th ward of the city of New-York, and butted and bounded as follows, to wit: beginning at a point on the westerly side of Essex-street, distant southwardly from the southwesterly corner of Stanton-street and Essex-street, 100 feet; thence running southerly along the westerly side of Essex-street, 50 feet; then westerly on a line parallel with Stanton-street, to a point equally distant from Essex-street and Ludlow-street; then northerly on a line equi-distant from Essex-street and Ludlow-street, 50 feet; then easterly on a line parallel with Stanton-street, to the place of beginning." That on the 2d day of June, 1827, the said Peter A. Jay employed Henry P. Jones to act as cognizor in the levying said fine. That after the 2d day of June, 1827, the said E. L. Winthrop entered upon lot No. 1397, and inclosed the same with a substantial fence in common with the land adjacent, comprised in the premises last described. That such entry upon the said lot No. 1397, and inclosure thereof, was with intent to levy a fine of the said lot, in common with said adjacent lands. That on the 14th day of June, 1827, the said E. L. Winthrop and the said Henry P. Jones entered upon the said last above described premises, and then and there, no other person or thing being on said last described premises, the said E. L. Winthrop, in presence of two competent witnesses, executed and delivered to said Henry P. Jones a deed of feoffment to the said Henry P. Jones, his heirs and assigns, of said premises, and at the same time, in presence of the said witnesses, delivered to the said Henry P. Jones a portion of the earth of said last described premises, in the name of livery of seisin of said premises. That on the 15th day of June, 1827, the said E. L. Winthrop and the said Henry P. Jones entered upon the said last described premises, and then and there, in the presence of said last mentioned witnesses, the said Henry P. Jones executed and delivered to E. L. Winthrop a deed of feoffment to the said E. L. Winthrop, his heirs and assigns. The deed and warranty were upon the consideration of $2000. That such deeds of feoffment, chirograph of the fine and enrollment and recording of the same, are all in due form to constitute

the necessary written or documentary evidence of levying said fine. That since the levying of said fine E. L. Winthrop and those claiming under him, have been in the actual and exclusive occupation of the said last described premises. But whether, &c.

*J. Ellsworth,* for the plaintiffs.

*W. Rutherford,* for the defendant.

EDWARDS, J. The case shows that the original source of the title set up by the plaintiffs, was a deed of conveyance executed by the commissioners of forfeiture for the southern district of New-York on the 31st of May, 1785. It appears by the description contained in the deed, and it is admitted by the defendant, that the property in question had belonged to James Delancy, and that it was forfeited to the state by an act of attainder, passed on the 22d of October, 1776. (1 *Greenleaf's Laws,* 26.) The conveyance was made in pursuance of the powers which had been conferred upon the commissioners by an act of the legislature, passed on the 19th of May, 1784. (*Greenl. Laws,* 127.)

The defendant contends that by the treaty of peace, of September 3d, 1783, the forfeited estate was divested from the state of New-York, and was revested in James Delancy. This is clearly a misapplication of the effect of the treaty; for the article which is relied upon refers merely to future confiscations, and has no reference to attainders and forfeitures which had already become complete and absolute. In the cases cited upon the argument, the proceedings of forfeiture were in progress, and undetermined at the time when the treaty was concluded.

The next objection which was made to the plaintiff's title is, that the second John McGregor, or John McGregor the younger, as he is called in the case, was never seised of the premises in question; and the defendant moved for a nonsuit on that ground. This objection must, of course, refer to the alleged want of an actual seisin; for that he had a seisin in deed cannot admit of a doubt. But, conceding that there never was any seisin in law in John, the younger, I do not perceive how this should entitle

McGregor *v.* Comstock.

the defendant to a nonsuit. He does not found his objection upon a descent cast; and it is only in that point of view that an objection to the plaintiff's right of recovery could be taken advantage of by way of nonsuit. It may become important, however, in reference to the principal question which is raised in the case, as to the validity of the fine which was levied by Winthrop, to ascertain what was the extent of the seisin of the premises by John the younger, anterior to the time of the levy.

The case shows that John, the elder, died in the year 1802, and that his son John was at that time about two years old. It also appears that John, the younger, was sent to England by his uncle at the age of six years, and that he remained there till the year 1817 or 1818, when he was sent to the East Indies; and that he has not been heard of since, and is supposed to be dead. There is no pretense that he ever took actual possession of the premises, either in person or by his agent. One of his guardians states that he received the rents of, and paid the taxes upon, two lots in Essex-street. But it does not appear that any one acting on John's behalf, ever in any way interfered with or asserted any title to the lot in question. It would seem, then, that he, during his lifetime, and his heirs at law since his death, if he died as is supposed, had a seisin in deed of the premises; and, if there was no disseisin or adverse possession, had a seisin in law either actual or constructive.

On the part of the defendant, it appears that on the 20th August, 1817, a partition was made of what was called the Stuyvesant estate; and the partition deed, amongst other things, conveyed the premises in question to Margaret Stuyvesant in fee simple. This is the first evidence furnished to us of any claim to the property set up by the Stuyvesant family. On the fifth day of January, 1824, Margaret Stuyvesant made her will; by which she devised the premises to Egerton Leigh Winthrop, in fee simple, and shortly afterwards she died. It also appears that during the years 1818 and 1819, the premises were taxed to unknown owners; that the taxes were in fact paid by Mrs. Stuyvesant, and that from the latter period down to the year 1826, she or Winthrop were taxed and assessed as owners of the

property; and that the taxes and assessments were paid by them. In the year 1827, a fine was levied by Winthrop, and he and his representatives have since been in the sole and exclusive possession of the premises. It is upon the title thus acquired that the defendant relies.

The plaintiffs do not deny the regularity of the proceedings on the part of Winthrop, in levying the fine; but they contend that he had not such an estate in the premises as authorized him to make the levy.

It is an elementary principle that in order to make a fine of any avail at all, the parties must have some interest or estate in the lands to be affected by it. (2 *Bl. Com.* 337.) Or, as it is more definitely expressed, a person to levy a fine, must have a freehold either by right or by wrong. (*Doe* v. *Davis*, 1 *Carr. & Payne*, 130.) And in order to create a freehold by wrong, there must be a disseisin. (*Ib.* *Doe* v. *Gregory*, 2 *Ad. & Ellis*, 14. 5 *Bing. N. C.* 161.) The question then arises, whether Winthrop had such a freehold as the law requires.

The case shows that at the time when the fine was levied, the premises were in the outskirts of the city, where lots were but little used, either for building or agricultural purposes, and where it was difficult to keep them fenced. The jury have found that the lot in question was fully enclosed at the time of the levy; and the reasonable inference is, that it was so enclosed by Winthrop; and there is a distinct admission in the case that he had " actual and exclusive possession of the premises" at that time.

The counsel for the plaintiffs contended upon the argument, that to constitute a disseisin, there must be an expulsion of the rightful owner by violence; and that there could not be a disseisin in the case of vacant lands. If such were the rule of law, I should say at once that the title which is set up by the defendant has wholly failed. But no such rule is laid down either in the authorities of England or of this state; and it seems to me that it cannot be sustained upon principle. The rule laid down by Ch. J. Kent, in the case of *Smith* v. *Burtis*, (6 *John.* 197, 216,) is, that " the rightful owner must be expelled

McGregor *v.* Comstock.

by violence, or by some act which the law regards as equivalent in its effects." He further says, that "a peaceable entry upon land apparently vacant, furnishes *per se* no presumption of wrong. The benign and legal intendment is otherwise." This is, undoubtedly, a correct statement of the rule as deducible from the English authorities. And in the case of *Doe* v. *Thompson,* (5 *Cowen,* 371,) the same rule is laid down. In these cases the question was as to what would constitute a disseisin upon which a descent might be cast, and not as to what would be a sufficient disseisin to authorize the levy of a fine.

The mere entry on land is clearly not sufficient to constitute an ouster of the true owner; for the presumption of law is that such entry is under the title of the true owner, and not in hostility to it; or, as it is expressed in the books, such an entry is supposed to be *congeable,* and the burthen of proving the contrary lies upon the person who sets up a disseisin. There certainly cannot be a seisin in the true owner, and the disseisor at the same time; and it is undoubtedly true, as was said by Ch. J. Parsons, (*ubi infra,*) that where a man is once seised of land, his seisin is presumed to continue till a disseisin is proved. But can it be said that a seisin in law, either actual or constructive, continues in favor of the true owner, when another person holds exclusive possession of the property, and claims it as his own? All that the law requires, to constitute a disseisin is, that there shall be a new seisin in hostility to the true owner. In a case where the owner is in the actual perception of the profits, or has *possessio pedis,* there could hardly be a dispossession without violence. On the other hand, in the case of vacant lands, violence is impossible. But does it follow from this that there cannot be a disseisin without violence? It seems to me, that it follows, rather, that where there is no violence, and where, from the circumstances of the case there can be none, the law will infer a disseisin from such other acts as show that the possession is adverse and hostile to that of the true owner. In the case of *Proctor* v. *Small,* (15 *Mass. Rep.* 498,) the court, in speaking of this subject, say that "this being a negative proposition, it cannot commonly be proved by positive testimony; it

McGregor v. Comstock.

may, therefore, be inferred from circumstances." They also say that "disseisin does not necessarily imply a forcible entry, or an actual ouster by violence or fraud; for in case of vacant lands, a simple tortious entry, and open exclusive possession under a claim of adverse title, are equivalent to such entry and ouster." The principles here laid down do not seem to me to be at all inconsistent with the decisions which have been made in England and in this state. On the contrary, they are the established principles of the common law applied to a state of things which seldom exists in the parent country, but which is of common occurrence here.

In the case before us it appears that Winthrop had claimed title to the premises adverse to that of the true owner for some years, and had supposed that he had a good title; that he had been regarded by others as the owner, and had been taxed and assessed as such, and had paid the taxes and assessments; that the lot had been enclosed by a fence, which every reasonable presumption would lead us to believe was placed there by him, and it is admitted that he had the actual and exclusive possession at the time that the fine was levied. It seems to me that these are acts which the law will regard as equivalent in their effects to an actual expulsion by violence; and that they establish such a freehold, by disseisin, in Winthrop, as will sustain the fine levied by him.

There should be judgment for the defendant.

MITCHELL, ROOSEVELT and MORRIS, Js. concurred.

EDMONDS, P. J. dissented.

Judgment for the defendant.

[NEW-YORK GENERAL TERM, October 3, 1853. Edmonds, Edwards, Mitchell, Roosevelt and Morris, Justices.]