**ROBINS ISLAND PRESERVATION FUND, INC., Plaintiff–Appellant,**

v.

**SOUTHOLD DEVELOPMENT CORPORATION, Defendant–Appellee.**

**No. 220, Docket 91–7490.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1991.

Decided March 23, 1992.

Bertram E. Hirsch, Floral Park, N.Y., for plaintiff-appellant.

Samuel Kirschenbaum, Garden City, N.Y. (Ira Levine, Kirschenbaum and Kirschenbaum, P.C., of counsel), for defendant-appellee.

Before: MESKILL, WINTER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

This appeal stems from a property dispute encompassing events which took place over two centuries ago when the State of New York seized land belonging to individuals who refused to support the American Revolution. The property at issue is Robins Island, an island of approximately 445 acres in the Peconic Bay of Long Island. In 1779, Parker Wickham, then the owner of Robins Island, was stripped of title to this property as punishment for his continued allegiance to the British monarchy.

Plaintiff-appellant Robins Island Preservation Fund ("RIPF"), is a non-profit corporation dedicated to the preservation of Robins Island in its natural state. RIPF alleges that it is the rightful owner of an approximate 75 percent undivided interest in Robins Island, which it claims as successor-in-interest to Parker Wickham, whom RIPF charges was unlawfully deprived of title and possession. Specifically, RIPF claims that New York's Act of Attainder of 1779, pursuant to which the State of New York confiscated and sold the island, was invalid, because at the time of its passage New York had no sovereignty over Robins Island, which was then under British control. RIPF further argues that even if the Act of Attainder were valid in general, it was invalid with regard to Robins Island because New York took physical possession of Robins Island only after the enactment of the Treaty of Peace of 1783 between Great Britain and the United States, which prohibited future confiscations of British and loyalist property. As an alternative theory, RIPF contends that the Act of Attainder of 1779 seized only a life estate and not a fee simple interest in Robins Island, title to which passed on Parker Wickham's death to his son, Joseph Parker Wickham.

RIPF initiated the underlying action in the United States District Court for the Eastern District of New York (Leonard D. Wexler, *Judge*), seeking, *inter alia*, a declaration of ownership rights in Robins Island against defendant-appellee Southold Development Corporation ("SDC"). SDC is a New York corporation which plans to develop Robins Island. SDC traces its title to its predecessors-in-interest, Benjamin Tallmedge and Caleb Brewster, who in 1784 purchased the island in fee simple from the State of New York. SDC asserts that the seizure and sale of the island during the American Revolution was valid. In addition, SDC initiated a third-party complaint against the State of New York seeking damages in the event of loss of title.

RIPF and SDC cross-moved for summary judgment. Additionally, New York moved for summary judgment against SDC on the third-party complaint. The district court granted summary judgment for SDC and New York, holding, *inter alia*, that the Act of Attainder of 1779, pursuant to which New York acquired title to the island, was valid and that the action was barred by New York's statute of limitations, the doc-

trine of laches, and public policy. *See Robins Island Preservation Fund v. Southold Dev. Corp.*, 755 F.Supp. 1185 (E.D.N.Y. 1991). RIPF appeals the grant of summary judgment to SDC.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

This action brought by RIPF requires us to revisit the events surrounding our nation's birth in revolution. However, the events of the American Revolution which we must consider are not widely celebrated today. These events relate to the systematic confiscation of property belonging to those Americans who refused to join the Revolution. We are asked to examine the property rights of persons as they existed over two hundred years ago—when the newly formed states were fighting both British troops and British sympathizers, when individuals could be convicted without trials, and when ancient doctrines controlled the laws of property. Because the underlying action is deeply rooted in historical events, we begin by examining the circumstances surrounding the ownership and confiscation of Robins Island in the eighteenth century.

### A. *Parker Wickham's Inheritance*

In 1715, Joseph Wickham, Sr. purchased Robins Island. In 1734, he devised the island to his son Joseph Wickham, Jr. "and to the male heirs of his body lawfully begotten or to be begotten forever." This devise created an "estate tail" by which the devisee, and subsequently his male heirs, would hold only a "fee tail" interest in the property, which would pass at death to the next directly descended male heir. Using this means of conveyance, Joseph Wickham, Sr. intended to pass title to Robins Island from generation to generation in a direct and perpetual line of descent.

At the death of his father, Joseph Wickham, Jr. took possession of the estate. Upon his death in 1749, the land passed to his eldest son, Parker Wickham.

### B. *The Act of Attainder*

Parker Wickham was a "loyalist" during the American Revolution. Loyalists were those colonists who maintained their allegiance to the King of Great Britain. This was not unusual in New York which, among the original thirteen colonies, had the largest number of inhabitants sympathetic to the British monarchy. The pro-Crown sympathies of New York's large loyalist population facilitated the capture and occupation by British troops of most of the southern portion of the state, including Long Island, in 1776. Consequently, Robins Island remained under British control for the remainder of the war.

Perceiving a threat to the Revolution, American patriots clamored for measures to punish loyalists. In response, the Continental Congress declared on June 24, 1776, that the property of all adherents to the Crown would be liable to confiscation. *See* Allan Nevins, *The American States During and After the Revolution 1775–1789*, at 268 (1969). Following this declaration, New York, under intense pressure from patriot citizens, enacted a series of similar measures resulting in the seizure of loyalist and British property and the disenfranchisement of all persons who either had refused to recognize the authority of the revolutionary government or had aided the British. *See id.*

These measures did not, however, satisfy the more zealous patriots, many of whom were members of the newly convened New York State Legislature. Bowing to intensified popular pressure, the New York State Legislature on October 22, 1779 passed "An Act for the forfeiture and sale of the estates of persons who have adhered to the enemies of this state" ("Act of Attainder"), commonly known as the Confiscation Act, which declared Parker Wickham and fifty-eight other individuals *ipso facto* convicted of "adherence" to the British. *See* Act of Attainder of October 22, 1779, 1779 N.Y.Laws 3rd Sess., ch. 25 at art. 1. As punishment, all property owned by the "attainted" individuals was declared to be immediately forfeited to the State of New York. *See id.*

## C. *The Act to Abolish Entails of 1782*

As the war drew to a close, the American states turned their attention toward eradicating the more offensive vestiges of aristocracy brought to the colonies by wealthy British settlers. An early target was the "estate tail." The estate tail, or "fee tail," was a freehold estate in which there was a permanently fixed line of inheritable succession, strictly limited to the natural children of the grantee or devisee. The use of the estate tail to keep ancestral lands in one family had provided landed British aristocracy with a basis of social and political power seen as incompatible with either the ideals underlying the American Revolution or the social conditions in the new states. *See* Cornelius J. Moynihan, *Introduction to the Law of Real Property* § 6, at 37 (2d ed. 1988) ("Moynihan"); Gregory S. Alexander, *Time and Property in the American Republican Legal Culture*, 66 N.Y.U. L.Rev. 273, 295–302 (1991).

The New York State Legislature abolished the estate tail in 1782. In so doing, the Legislature provided:

That in all cases, wherein any person or persons would, if this law had not been made, had been seized in fee-tail, of any lands tenements heriditaments, such person or persons shall, in future, be deemed to be seized of the same in fee-simple.

Act to Abolish Entails of July 12, 1782, 1782 N.Y.Laws 6th Sess., ch. 2 at art. 1. The effect of this Act was to convert all estates tail into estates in fee simple. In 1786, New York passed an almost identical "Act to Abolish Entails" whose only difference lay in curing ambiguities created by omission in the former enactment. *See* Act to Abolish Entails of February 23, 1786, 1786 N.Y.Laws 9th Sess., ch. 12.

## D. *The Treaty of 1783*

While the attention of the fledgling states was focused on domestic reforms such as these, formal hostilities between the United States and Great Britain concluded. The Provisional Treaty of Peace ("Provisional Treaty"), was signed by the two countries on November 30, 1782 and ratified by Congress on April 15, 1783. *See* Provisional Treaty of Peace, Nov. 30, 1782, U.S.–Gr.Brit., 8 Stat. 54. The Definitive Treaty of Peace ("Treaty of 1783" or "the Treaty"), which was almost identical to the Provisional Treaty, was concluded on September 3, 1783. *See* Treaty of Peace, Sept. 3, 1783, U.S.–Gr.Brit., 8 Stat. 80. Articles Five and Six of the Treaty of 1783 provided:

### Article 5th

It is agreed that the Congress shall earnestly recommend it to the Legislatures of the respective States, to provide for the Restitution of all Estates, Rights and Properties, which have been confiscated belonging to real British Subjects; and also of the Estates, Rights and Properties of Persons resident in Districts in the Possession of his Majesty's Arms and who have not borne Arms against the said United States....

And it is agreed that all Persons who have any Interest in confiscated Lands, either by Debts, marriage Settlements or otherwise, shall meet with no lawful Impediment in the prosecution of their just Rights.

### Article 6th

That there shall be no future Confiscations made nor any Prosecutions commenced against any Person or Persons for, or by Reason of, the Part which he or they may have taken in the present War, and that no Person shall on that Account suffer any future Loss or Damage either in his Person, Liberty or Property; and that those who may be in Confinement on such Charges at the time of the Ratification of the Treaty in America, shall be immediately set at Liberty, and the Prosecutions so commenced be discontinued.

The Treaty's provision in Article 5 paragraph 1, that Congress recommend to the states that British and loyalist property be returned, was largely ignored by state governments. In New York, the withdrawal of British troops was quickly followed by the physical seizure of land that New York

had declared confiscated pursuant to the Act of Attainder of 1779. Parker Wickham fled to Connecticut, presumably to escape the penalty of death carried by the Act of Attainder, and remained there until his death in 1785. At about the same time, his eldest son, Joseph Parker Wickham, left the United States. In May 1784, the New York State Legislature passed an "Act for the Speedy Sale of Confiscated Estates" ("Speedy Sales Act"), which provided for the sale of lands seized pursuant to the Act of Attainder of 1779. *See* Speedy Sales Act of May 12, 1784, 1784 N.Y.Laws 7th Sess., ch. 64. Several months later, New York sold Robins Island to Benjamin Tallmedge and Caleb Brewster in fee simple.

### E. *The Jay Treaty of 1794*

The states did not, however, rest at enforcing punitive measures already enacted. Either ignorant of the provisions of the Treaty of 1783, or motivated by anti-loyalist passion, punitive actions and seizures of property continued. *See, e.g., Bain v. The Schooner Speedwell,* 2 U.S. (2 Dall.) 33, 1 L.Ed. 280 (Adm.Ct.App.1784) (reversing condemnation by the Admiralty of Rhode Island because ship in question was captured after the Treaty went into effect). New York was among those states passing measures contrary to the Treaty of 1783. *See, e.g., Carver v. Jackson,* 29 U.S. (4 Pet.) 1, 7 L.Ed. 761 (1830) (statute requiring successors-in-interest to dispossessed loyalists to pay for improvements made by tenant who purchased land confiscated by New York pursuant to Act of Attainder of 1779 held violative of Treaty of 1783); *Fisher v. Harnden,* 9 F.Cas. (1 Paine) 129 (C.C.D.N.Y.1812) (confiscation of lands following post-Treaty conviction under procedure provided in 1779 Act of Attainder held invalid under Treaty of 1783), *rev'd on other grounds sub nom., Harden v. Fisher,* 14 U.S. (1 Wheat.) 139, 4 L.Ed. 96 (1816).

The British, in turn, committed their own violations of the Treaty by expropriating thousands of slaves to England and by refusing to abandon their posts on the Northwestern frontier. *See* John Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation,* 83 Colum.L.Rev. 1889, 1917–18 (1983). When, in 1791, Thomas Jefferson requested a statement from the newly-arrived British Minister Plenipotentiary regarding whether Great Britain intended to honor its treaty obligations requiring the evacuation of American territory and forbidding the taking of slaves, he was told that the King "was induced to suspend the execution of that article, on his part, in consequence of the non-compliance, on the part of the United States, with the engagements contained in the fourth, fifth, and sixth articles of the same treaty." *Id.* (quoting Letter from Jefferson to Hammond of Nov. 29, 1791 and Letter from Hammond to Jefferson of Nov. 30, 1791, *reprinted in* 1 *American State Papers:* 1 Foreign Relations 188–89 (1832)).

As a result of these violations, tensions between the United States and Great Britain threatened to erupt again into armed conflict. In 1794, John Jay was sent to England to negotiate an agreement concerning the enforcement of the Treaty of 1783. The resulting agreement, commonly referred to as "the Jay Treaty," was signed on November 19, 1794 and embodied an American commitment to cease punitive measures and to permit British subjects to seek redress in American courts despite their foreign alienage. *See* Treaty of Amity ("Jay Treaty"), Nov. 19, 1794, U.S.–Gr. Brit., 8 Stat. 116. Article Nine of the Jay Treaty provided:

> It is agreed that British subjects, who now hold lands in the territories of the United States, ... shall continue to hold them according to the nature and tenure of their respective estates and titles therein; and may grant, sell, or devise, the same, to whom they please, in like manner as if they were natives; and that neither they, nor their heirs or assigns, shall, so far as may respect the said lands, and the legal remedies incident thereto, be regarded as aliens.

As revolutionary fervor cooled, the enforcement of the Treaty of 1783 became more consistent. Loyalists who had fled the United States felt secure in returning. In

1789, Joseph Parker Wickham received 2,800 pounds sterling from Great Britain as consideration for the loss of his father's estate. Two years later, he returned to Long Island where he resided for the remainder of his life.

Before turning to the underlying action, we set forth a time line of pertinent events:

1715 Joseph Wickham, Sr. purchases Robins Island.

1734 Joseph Wickham wills Robins Island to his oldest son, Joseph Wickham, Jr. in fee tail.

1749 Joseph Wickham, Jr. dies. His oldest son Parker Wickham survives and takes title to Robins Island.

1754 Joseph Parker Wickham, first son of Parker Wickham, is born.

July 4, 1776 The Declaration of Independence is signed.

July 9, 1776 The Provincial Congress of the State of New York approves the Declaration of Independence.

July 16, 1776 The Provincial Congress of the State of New York resolves that all persons within the state owe allegiance to its laws.

Aug. 1776 American revolutionary forces leave Long Island.

Apr. 20, 1777 New York adopts its first state constitution.

Oct. 22, 1779 Parker Wickham and others are attainted under New York's Act of Attainder; Robins Island is declared confiscated.

July 12, 1782 The New York State Legislature abolishes the estate tail.

Nov. 30, 1782 The Provisional Treaty of Peace is signed.

Apr. 15, 1783 The Provisional Treaty of Peace is ratified by Congress.

Sept. 3, 1783 The Definitive Treaty of Peace is concluded.

Nov. 1783 British forces commence evacuation of Long Island.

May 12, 1784 The New York State Legislature passes the Speedy Sales Act, expediting the sale of confiscated estates.

Aug. 5, 1784 Robins Island is sold to Benjamin Tallmedge and Caleb Brewster pursuant to the Speedy Sales Act.

May 22, 1785 Parker Wickham dies.

1791 Parker Wickham's oldest son, Joseph Parker Wickham, returns to Southold, Long Island after receiving compensation from Great Britain for the loss of his father's estate.

*See* Dwight Holbrook, *The Wickham Claim* 14–15 (1986) ("Holbrook").

F. *The Underlying Action*

RIPF initiated this action against SDC seeking, among other things, title and possession to Robins Island. RIPF claims title based on various quitclaim deeds it holds from the successors-in-interest to Parker Wickham. In total, RIPF has accounted for approximately a 75 percent undivided interest in Robins Island. Both RIPF and SDC moved for partial summary judgment on the issue of ownership. In support of its motion, RIPF offered several theories of recovery, which it again offers on appeal.

RIPF first charges that because Long Island was not under American control at the time the Act of Attainder was passed, the Act was a nullity at its inception. Secondly, RIPF contends that even if the Act of Attainder were valid when passed, it had no legal effect until Long Island actually came under American control sometime after the British withdrawal, which began late in 1783 and concluded in 1784. According to RIPF, by the time New York took actual possession of Robins Island—an action which RIPF contends is necessary to complete a confiscation—the seizure violated the Treaty of 1783 which had prohibited all post-treaty confiscations of loyalist land.

In the alternative, RIPF insists that the Act of Attainder of 1779 seized only the estate held by Parker Wickham, the attainted loyalist, and not the estate vested in his heirs. Specifically, RIPF notes that in 1754, Parker Wickham had produced a son and male heir, Joseph Parker Wickham. RIPF characterizes the property interest of Joseph Parker Wickham as a "remainder in fee tail" which vested in Joseph Parker Wickham at his birth. The Act of Attainder, according to RIPF, did not seize vested

remainders belonging to the children of those attainted, and therefore, New York could only have seized what Parker Wickham himself held—essentially a life estate. RIPF maintains that the "vested remainder" of Joseph Parker Wickham was left untouched by the attainder of his father. Consequently, RIPF argues, when New York transformed estates tail into estates in fee simple in 1782, Joseph Parker Wickham's interest was transformed into a vested remainder in fee simple. Thus, RIPF concludes that when New York sold the property in 1784 pursuant to the Speedy Sales Act, the purchaser acquired only a life estate for the life of Parker Wickham and not a fee simple interest, as New York had purported to convey.

In support of its motion for summary judgment, SDC denied that RIPF is the rightful owner of Robins Island and asserted that, in any event, this action was barred by, among other things, the New York statute of limitations, and the equitable doctrine of laches. In addition, the State of New York moved for summary judgment on the third-party complaint brought by SDC for indemnity and contribution.

The district court denied RIPF's motion for summary judgment and granted summary judgment for SDC and New York, holding, *inter alia*, that the Act of Attainder of 1779, pursuant to which New York acquired title to the island, was valid, that New York's abolition of estates tail in 1782 extinguished the property interest of the Wickham heirs, and that the action was barred by the New York statute of limitations, the doctrine of laches and public policy. *See Robins Island*, 755 F.Supp. at 1191–95.

RIPF now appeals from the district court's judgment. SDC does not appeal from the grant of summary judgment on the third-party complaint brought by SDC for indemnity and contribution.

## DISCUSSION

### I. *The Validity of the Act of Attainder*

The Act of Attainder of 1779 named fifty-nine loyalists and declared them "at-tainted" and convicted of "adherence" to the British. The preamble to the Act of Attainder provided that those individuals

> holding or claiming property within this State have voluntarily been adherent to the said King and his fleets and armies, enemies to this State, and the said other United States, with intent to subvert the Government and liberties of this State and the said other United States, and to bring the same in subjection to the crown of Great Britain by reason whereof the said persons have severally justly forfeited all right to the protection of this State and to the benefit of the laws under which said property is held or claimed.

As one of those named, Parker Wickham was

> declared to be *ipso facto* convicted and attainted of the offence aforesaid, and that all and singular the estate, both real and personal, held or claimed by them, the said persons severally and respectively, whether in possession, reversion or remainder, within this State, on the date of the passing of this act, shall be and hereby is declared to be forfeited to, and vested in the people of this State.

Act of Attainder of October 22, 1779, 1779 N.Y.Laws. 3rd Sess., ch. 25 at art. 1. The effect of this attainder was, therefore, immediately to strip Parker Wickham of title to all property owned by him within the State of New York.

■ RIPF contends that because the British were occupying Long Island at the time of the Act of Attainder, it was a nullity at its passage. We disagree.

In adjudicating property rights affected by New York's Act of Attainder of 1779, neither the Supreme Court nor any court of New York State has ever declared the Act to be invalid. *See, e.g., Carver v. Jackson* 29 U.S. (4 Pet.) 1 (1830); *Harden v. Fisher,* 14 U.S. (1 Wheat.) 139 (1816); *McGregor v. Comstock,* 16 Barb. 427 (1853), *aff'd,* 17 N.Y. 162 (1858). Indeed, in a case arising shortly after the American Revolution, the Supreme Court expressly recognized that "the exclusive right of confiscating, during the war, all and every species of British

property, within the territorial limits of [an American state], resided only in the legislature of that [state]." *Ware v. Hylton,* 3 U.S. (3 Dall.) 158, 176, 1 L.Ed. 568 (1796) (Chase, *J.*). As property within the territory of the State of New York belonging to an individual who remained loyal to the British Crown, Robins Island was susceptible to confiscation at any time after the commencement of hostilities. Accordingly, we reject RIPF's premise that the Act of Attainder was a nullity at its inception because Long Island was under enemy occupation.

■ RIPF next claims that the Act of Attainder of 1779 was invalid as applied to Robins Island because the property was physically seized after the Treaty of 1783 was executed, thus constituting a prohibited "future confiscation" under Article Six of the Treaty. We reject this contention.

It is undisputed that while Article Five of the Treaty of 1783 merely recommended that the states restore property confiscated during the war, Article Six prohibited any future acts of punishment, including confiscation of property, against American loyalists and British subjects.[1] The issue presented is whether New York's confiscation of Robins Island was completed prior to the signing of the Provisional Treaty, in which case it constituted a proper exercise of New York's power to confiscate enemy property, or after, in which case it violated the Treaty's prohibition on future confiscations.[2] Specifically, we examine whether the confiscation of Robins Island was fully effected upon the date of passage of the Act of Attainder of 1779, or upon actual possession by New York sometime after the Treaty of 1783 went into effect.

In *Smith v. Maryland,* the Supreme Court decided this issue in regard to another state's act of confiscation. 10 U.S. (6 Cranch) 164, 3 L.Ed. 225 (1810). At issue in *Smith* was Maryland's Act of October 1780 which purported "to seize, confiscate, and appropriate all British property within [the] state." *Id.* Pursuant to that Act, Maryland claimed the right to the estate of a British property owner. However, because the state remained unaware of its claim on this property until 1801, the state did not take actual possession until long after both the Treaty of 1783 and the Jay Treaty of 1794 had taken effect. *See id.* In deciding whether Maryland's purported sale of the property in 1803 violated the Treaty of 1783, the Supreme Court held that where a law authorizing a seizure is "completely operative to divest the whole estate of the former owner, and to vest it in the state ... it is perfectly immaterial, at what time the right of the state to the lands now in controversy, thus completed prior to the treaty, was discovered, or at what time actual seisin and possession was obtained." *Id.* at 176–77. The Court's decision in *Smith* established that a self-executing statute purporting to divest title absolutely was complete at the time of enactment. Thus, a confiscation made pursuant to such a statute would violate neither the Treaty of 1783 nor the Jay Treaty of 1794 regardless of when the state took actual possession.

New York's Act of Attainder of 1779, like the Maryland Act of 1780, was self-executing. This is clear from the language of Article Thirteen of the Act of Attainder which declares:

> That all titles, estates and interests, by executory devise or contingent remainder, claimed by any person hereby, or by virtue of this law, to be convicted, *shall on conviction be as fully forfeited to all*

---

1. The distinction in treatment of wartime and post-war confiscations is attributed to the general presumption held by the signatories that wartime confiscations "being in virtue of the laws of particular States, the Congress had no authority to repeal those laws." *See* Julius Goebel, Jr. ed., 1 *The Law Practice of Alexander Hamilton* 210 (1964) (quoting Letter from Benjamin Franklin to Secretary of Foreign Affairs Livingston of Oct. 14, 1781, *reprinted in* 5 Wharton, *Diplomatic Correspondence* 811).

2. Though the Constitution of the United States was not yet enacted, we assume for purposes of this opinion that the State of New York was bound by treaties entered into by the national Congress. 1 James Kent, *Commentaries on American Law* *155 (1st ed. 1826–1830) ("Treaties of peace, when made by the competent power, are obligatory upon the whole nation.").

*intents, constructions and purposes in the law whatsoever to the people of this State as any other titles, claims, estates or interests whatsoever.*

(emphasis added). Under this language a convicted property owner was fully and immediately divested of title, which in turn, was immediately revested in New York. We therefore hold that the estate of Parker Wickham was fully confiscated by the State of New York on October 22, 1779, the date of passage of the Act of Attainder.

As a result, the confiscation of Robins Island did not violate Article Six of the Treaty of 1783 which "refers merely to future confiscations, and has no reference to attainders ... which had already become complete and absolute." *McGregor v. Comstock*, 16 Barb. at 434 (holding that parcel of land in British-occupied "Southern District of New York," which was forfeited to the state by the Act of Attainder of 1779 and sold in 1785, did not violate the bar on future confiscations in the Treaty of 1783). We therefore find that it is of no moment when New York took actual physical possession of Robins Island.

## II. *The Estate Seized By New York*

■ RIPF next contends that even if the seizure were valid, New York seized and sold only the interest held by the attainted Parker Wickham which was, in essence, a life estate. Specifically, RIPF argues that because Parker Wickham had a son before the passage of the Act to Abolish Entails of 1782, Parker Wickham's son received at birth a vested remainder in fee tail. This remainder, according to RIPF, was not reached by New York's Act of Attainder of 1779, and was subsequently transformed into a remainder in fee simple by the Act to Abolish Entails of 1782. Thus, because New York had seized only the estate of Parker Wickham, RIPF argues this remainder in fee simple was left undisturbed by the sale of Robins Island. That is, the purchasers of Robins Island acquired only a life estate for the life of Parker Wickham. According to RIPF, upon Parker Wickham's death, Robins Island passed in fee simple to his son Joseph Parker Wickham.

This argument rests on an interpretation of the nature of the estate held by Parker Wickham, the reach of the Act of Attainder, and the effect of New York's Act to Abolish Entails. We examine these issues in turn.

### a. *The Estate Tail*

Prior to 1285, a gift or devise of real property to a man "and the heirs of his body" constituted a fee simple conditional. The fee was conditioned on the donee having heirs of his body. When this condition was satisfied, the donee had full power of alienation. *See* 2 Richard Powell, *The Law of Real Property* ¶ 193, at 62 (Patrick J. Rohan ed., 1990) ("Powell"). Upon the birth of issue to the donee, the only significant distinction between what the donee held and a fee simple estate was that in the event the donee died without leaving surviving issue and without having alienated the land, the property then reverted to the donor, regardless of the survivorship of collateral heirs. *See generally* Moynihan § 5, at 34. The power of alienation in the donee was the product of judicial construction which favored the free alienability of lands. However, the landed nobility of England grew dissatisfied with the result of this judicial construction which permitted the transfer of lands out of their families. Pressure by the nobility resulted in the enactment of the Statute De Donis Conditionalibus in 1285, which declared, contrary to prior judicial interpretation, that conveyances to a donee and "the heirs of his body" should be strictly construed to convey an estate which would without exception pass to the heirs of the donee's body. *See* Statute De Donis Conditionalibus, 13 Edw. I (1285).

Under the Statute De Donis Conditionalibus, the donee was said to hold an estate in fee tail (from the Latin *talliatum* or "cut out of the fee"). The "fee tail" could be further restricted to a specific class of heirs, such as "heirs male" or "heirs female." In all cases, the estate tail was, by definition, a freehold estate in which there was a fixed line of inheritable succession,

limited to the issue of the body of the grantee or devisee, and in which the regular and general succession of statutory heirs was cut off. Thus, under the Statute De Donis Conditionalibus, a donee no longer had a power of alienation.

However, the judicial preference for free alienability of land survived despite the enactment of the Statute De Donis Conditionalibus. English courts began to recognize a fictitious real action known as a "common recovery," whereby a holder of land in fee tail could effectively cut off the interest of the heirs as well as the reversionary interest of the donor. *See* Powell ¶ 193, at 63. After effecting a common recovery, the land holder owned the property in fee simple. The use of the common recovery to convert an estate in fee tail to one in fee simple was commonly referred to as "barring" or "docking the entail."

The rule of construction creating the estate tail was carried to the colonies where it was embodied in devises of land such as in the one concerning Robins Island. The use of the "common recovery" to bar entails was also recognized in the colonies, although it was used infrequently. *See, e.g., Duffy v. Jarvis*, 84 F. 731, 732 (C.C.E.D. Tenn.S.D.1898) (describing the "common recovery" procedure). Therefore, in the absence of any other action by either Parker Wickham or New York, Joseph Parker Wickham would have succeeded to the estate of his father, Parker Wickham, as owner in fee tail. However, before Joseph Parker Wickham could succeed to his father's estate, Robins Island was confiscated by New York.

### b. *The Estate Confiscated Pursuant to the Act of Attainder of 1779*

When New York confiscated the estate of Parker Wickham, it seized his fee tail ownership of Robins Island. RIPF contends that New York's seizure and sale of the land affected only the life interest held by Parker Wickham and did not destroy the future interest left to his heirs. RIPF characterizes the interest seized as a "life estate." In contrast, SDC argues that by seizing and selling Robins Island, New York exercised its right as tenant in tail to "bar the entail" of Parker Wickham's heirs. In essence, SDC contends that New York's confiscation of Parker Wickham's interest in Robins Island, pursuant to the Act of Attainder, cut off the future interest of Joseph Parker Wickham. We reject both arguments as misconstructions of the effect of the Act of the Attainder.

By its terms, the Act of Attainder stripped the attainted individuals of any and all title, ownership or interest in real property existing in the State of New York. The property interests of the offenders were then vested, absolutely and immediately, in New York. Because Parker Wickham owned Robins Island in fee tail, it was ownership in fee tail that was assumed by New York.

Since an attainder was a criminal conviction, it did not affect the rights of future generations. Indeed, it is axiomatic that the Act of Attainder "vest[ed] in the state ... the 'estates' only of the offenders." *Carver*, 29 U.S. at 57. It is well-settled that solely by virtue of an attainder, a sovereign did not destroy the future interests of heirs to an estate tail. *See* 4 James Kent, *Commentaries on American Law* * 13 (4th ed. 1830) ("[E]states tail were not liable to forfeiture for treason or felony...."); Moynihan § 5, at 35 (At early English common law, "[t]he estate in fee tail was not subject (beyond the tenant's lifetime) to forfeiture for treason or attainder for felony."). Thus, contrary to SDC's assertion, Parker Wickham's attainder for adherence to the British did not, in itself, "disentail" Parker Wickham's heirs. *See Borland v. Dean*, 3 F.Cas. 905, 908 (C.C.D.Mass.1826) (Story, *J.*) ("The power of barring the entail was personal to the tenant in tail" and a seizure of property by attainder appropriated the attainted party's tenancy in tail but did not extinguish the estate tail); *see also Carver*, 29 U.S. at 57 ("[P]owers and conditions, personal to the parties, did not, by an attainder, pass to the crown.").

We cannot conclude, however, that because a confiscation by attainder of an estate tail did not disentail an offender's

heirs, the estate confiscated was something less than full ownership in fee tail. In contrast to a life estate, an estate tail was, by definition, an estate in which the tenant in tail held virtually unfettered ownership rights to use the property as the tenant saw fit during his or her lifetime.

The rights of a tenant in tail were thus far broader than those of the holder of a life estate. *See* Harold G. Aron, *Aron's Digest of New York Real Property Law* 22 (1923) ( [B]efore, [the invention of the common recovery] or after, provided it was not taken advantage of, [the tenant in tail] had the fee for life; this is not at all the same as saying [the tenant] had a life estate in the fee...."); 4 James Kent, *Commentaries on American Law* * 18–* 19 (John M. Gould ed., 14th ed. 1896) ("Kent (14th ed.)") (discussing the differences in rights and duties between a tenant in tail and the holder of a life estate). For example, the holder of a life estate was liable to the owner of the future estate for waste. *See* Moynihan § 12, at 52–54. In contrast, "[t]he tenant in tail was not chargeable with waste." Kent (14th ed.) at * 12.

Simply stated, there is no evidence that in seizing Robins Island, New York changed the nature of the estate from an estate tail into a mere life estate. In short, when New York confiscated Robins Island, it stepped into Parker Wickham's shoes for the duration of Parker Wickham's life. We therefore conclude that the Act of Attainder of 1779 fully and completely confiscated Parker Wickham's fee tail ownership of Robins Island, which—in the absence of any further enactments—would have passed by inheritance to Joseph Parker Wickham, just as it would have passed had Parker Wickham remained owner.

### c. The Effect on Robins Island of the Act to Abolish Entails

In 1782, New York passed an "Act to Abolish Entails." *See* Act to Abolish Entails of July 12, 1782, 1782 N.Y.Laws, 6th Sess., ch. 2; *see also* N.Y. Est.Powers & Trusts Law § 6–1.2 (McKinney 1979). The Act to Abolish Entails of 1782 provided:

That in all cases, wherein any person or persons would, if this law had not been made, had been *seized in fee-tail*, of any lands tenements heriditaments, such person or persons shall, in future, be deemed to be *seized of the same in fee-simple.*

Act to Abolish Entails of July 12, 1782, 1782 N.Y.Laws 6th Sess. ch. 2 at art. 1 (emphasis added). In 1786, New York promulgated an almost identical "Act to Abolish Entails," which superceded the 1782 Act. *See* Act to Abolish Entails of February 23, 1786, 1786 N.Y.Laws 9th Sess., ch. 12.

New York's purpose in promulgating the 1782 and 1786 Acts was to remove the estate tail and the restraints on alienation it engendered. To implement this sweeping land reform, New York sought to eliminate the fee tail in both existing and future estates. Thus, the Acts transformed all existing estates in fee tail into estates in fee simple. *See, e.g., Wendell v. Crandall,* 1 N.Y. (1 Comstock) 491, 493 (1848) (In abolishing estates in tail, the legislature intended "the purpose of reaching all estates tail, without exception."). Furthermore, the acts nullified all future creations of estates in tail by providing that any attempt to convey title in fee tail would convey title in fee simple. *See, e.g., Lott v. Wykoff,* 2 N.Y. (2 Comstock) 355 (1849) (a 1797 devise of real property to a testator's sons in fee tail with contingent cross-remainders conveyed an estate in fee simple absolute with no contingent remainders). The Acts accomplished this reform by invoking the feudal concept of "seisin." Any person, "seized in fee tail" of an interest in land, was held to have an equivalent interest in fee simple. In other words, seisin of an estate in fee tail gave an individual seisin of an estate in fee simple.

In the present case, Robins Island already existed as an estate in fee tail prior to the enactment of New York's 1782 Act to Abolish Entails. Because an estate tail was already in operation, the 1782 Act vested an estate in fee simple in whomever was "seized in fee tail" of the property.

In determining in whom seisin lay, the district court considered both the nature of the estate tail and the effect of the 1782 Act to Abolish Entails. The district court concluded that Joseph Parker Wickham, as issue in tail, held only a "future possessory interest" and held that under the terms of the 1782 Act, issue in tail were not given a fee simple interest. *See Robins Island*, 755 F.Supp. at 1190. Therefore, the district court reasoned that after the passage of the 1782 Act, New York—as successor to Parker Wickham—held a fee simple interest which it properly conveyed in the 1784 sale of Robins Island. *See id.*

RIPF claims that the district court erred in construing the 1782 Act. Specifically, RIPF maintains that Joseph Parker Wickham's future interest constituted a "vested remainder in fee tail," which survived both the 1782 and 1786 Acts to Abolish Entails and was, in fact, augmented to a remainder in fee simple. We reject this assertion and agree with the district court that Joseph Parker Wickham's interest in Robins Island was extinguished by the 1782 Act to Abolish Entails.

The central issue presented here is whether, by operation of the 1782 Act, the fee simple arose in Parker Wickham—and hence in New York by way of the 1779 confiscation—or in Joseph Parker Wickham, as Parker Wickham's living male heir. More specifically, we must consider whether under the 1782 Act to Abolish Entails, "seisin" lay in the tenant in tail who had possession of the land or in his male heir who was not yet in possession.

"Seisin," a concept of vast and fundamental importance in early English law, connoted peaceful possession. Moynihan § 1, at 98. "The man who is seized is the man who is sitting on land; when he was put in seisin he was set there and made to sit there." *Id.* (quoting 2 Pollack and Maitland, *History of English Law* 30 (2d ed. 1899)). From its feudal roots, the concept gradually evolved to encompass a claim of title as well as one of possession. By the eighteenth century, seisin came to mean "possession under claim of a freehold estate therein." *Id.* Therefore, a tenant for a term of years had possession, but not seisin, of a freehold estate. A tenant in fee tail, however, had seisin as the owner of the property in possession of the land.

Significantly, seisin did not require actual physical possession of the property, but merely an immediate legal right to possess and enjoy it. Where there was actual or constructive possession by an owner, this was deemed actual seisin or seisin in fact. *See Vanderheyden v. Crandall*, 2 Denio 9, 21 (N.Y.Sup.Ct.1846), *aff'd sub nom.*, *Wendell v. Crandall*, 1 N.Y. (1 Comstock) 491 (1848); 1 Alfred G. Reeves, *A Treatise on the Law of Real Property* 379 (1909) ("Reeves"). Yet even absent an act of physical dominion, "[w]here the law casts the freehold upon a person[,] he has before exercising any act of ownership over it, what is called a sei[s]in in law." *Vanderheyden v. Crandall*, 2 Denio at 21; *see also* Reeves, at 379.

Under the common law there must always be someone seized of a freehold estate. *See* Earl P. Hopkins, *Handbook on the Law of Real Property* § 10, at 34 (1896). Moreover, there could be only one seisin of a freehold just as today there can be only one title deed to a piece of property. *See* 1 Emory Washburn, *A Treatise on the American Law of Real Property* 61 (Joseph Willard and Simon G. Coswell, eds. 5th ed. 1887). With regard to Robins Island, it is undisputed that until his attainder, Parker Wickham held both title and possession, and thus seisin, of Robins Island. By his 1779 attainder, Parker Wickham was stripped of his title and, consequently, of legal seisin of Robins Island. The Act of Attainder vested complete and absolute title in New York, and with title went legal seisin. Thus, by virtue of the Act of Attainder, New York obtained legal seisin of Robins Island which, following the withdrawal of the British in 1783, became actual seisin. Consequently, by virtue of the Act of Attainder, New York was "seized of an estate in fee tail." We therefore hold, that under the 1782 Act to Abolish Entails, New York's seisin of Robins Island as owner in fee tail was transformed into seisin as owner in fee simple.

Indeed, the result could not be otherwise. Joseph Parker Wickham, as issue in tail, had neither possession nor ownership of the property. In short, Joseph Parker Wickham did not hold seisin of Robins Island.

RIPF's reliance on *Van Rensselaer v. Kearney*, 52 U.S. (11 How.) 313, 13 L.Ed. 703 (1850), and *Vanderheyden v. Crandall*, 2 Denio 9 (N.Y.Sup.Ct. 1849), is not to the contrary. These cases involved the practical difficulties in construing the effect of the Acts on a devise of an estate tail which took effect after the estate tail was abolished. Both courts and commentators interpreted the Acts as establishing a "first taker" rule. Under this rule, any grant or devise to an individual "and the heirs of his body," which took effect after the 1782 Act, conveyed title in fee simple to the named individual—the first taker. *See* Reeves, at 617–618 (1909) ("New York ... abolished the fee tail by making it a fee simple in the first taker."). *Van Rensselaer v. Kearney* and *Vanderheyden v. Crandall* considered the peculiar difficulty in construing the first taker rule when the would-be first taker of a remainder in fee tail which was to follow a life estate, died while the life estate was still running. *See, e.g., Van Rensselaer v. Kearney*, 52 U.S. 313 (construing a devise to A for use during A's natural life followed by a remainder in fee tail to A's first son, where A's son died during A's lifetime); *Vanderheyden v. Crandall*, 2 Denio 9 (construing a devise in trust for the life of A, remainder in fee tail to the first son of A where the first son died during A's lifetime). In such cases, courts construed the Acts broadly and held that because the first taker's fee tail remainder vested upon his birth as the first son, the heir had "legal or equitable seisin" even though he died before taking possession of the land. As a result, a holder of a remainder in fee tail was deemed "seized of an estate in fee tail" for the purposes of the 1782 and 1786 Acts to Abolish Entails. *See Vanderheyden v. Crandall*, 2 Denio at 24 ("The remainder in fee tail had vested in [the remainderman] and he was therefore seized of it" creating an interest which was "changed to a fee simple."); *accord Van Rensselaer v. Kearney*, 52 U.S. at 334–36 (holding same).

No intricate first taker problem is involved, however, in the case of Robins Island. As an estate already existing in fee tail when the 1782 Act to Abolish Entails was promulgated, seisin lay in the title holder—New York.

This result is not contrary to the settled doctrine expounded by learned commentators, such as Justice Story, that an attainder did not in and of itself disentail the attainted individuals heirs. The future interest of Joseph Parker Wickham was not confiscated by any punitive measure directed at his father. Rather, it was extinguished as part of land reform legislation of general applicability which reached and removed the future interests of *all* issue in tail and vested a fee simple in the tenant in tail without regard to that party's identity.

We therefore hold that by operation of the Act to Abolish Entails of 1782, Joseph Parker Wickham's future interest in Robins Island was extinguished. We address, however, the alternative holding of the district court that this claim is time-barred.

### III. *Time Bars*

We are presented with no information explaining the failure of Parker Wickham's heirs to bring this claim earlier. It is undisputed that Joseph Parker Wickham returned to Southold in 1791 and purchased a farm on which he spent the remainder of his life. *See* Holbrook, at 114. Yet, there is no evidence that Joseph Parker Wickham prosecuted his claim to Robins Island or to the other land formerly contained in his father's estate. Indeed, there is no evidence that any of the Wickham heirs, many of whom continued to live on Long Island, have sought, before now, a declaration of title to Robins Island.

RIPF does not attempt to excuse this delay, but argues that a claim by a loyalist heir is timely, regardless of the passage of centuries. In support of this claim, RIPF resorts to language in the Treaty of 1783 which it maintains gives rise to a "treaty-based" cause of action. Specifically, RIPF

contends that Article Five, paragraph 2 of the Treaty of 1783, which provides that the claims of dispossessed loyalists and British subjects shall meet with "no lawful impediment" suspends the operation of any and all time bars on causes of action arising from wartime confiscations of property. RIPF further argues that as to British subjects, this suspension of all time-bars was confirmed by Article Nine of the Jay Treaty of 1794. In essence, RIPF contends that the Treaty of 1783 created a right of action in perpetuity for descendants of dispossessed loyalists. We disagree.

### a. The Treaty of 1783 and the Jay Treaty of 1794

■ We find no logic in the proposition that Great Britain and the United States bargained for and created a right of action that would survive the inaction of the aggrieved parties and their heirs over a period of centuries. RIPF's interpretation of the Treaty of 1783 and the Jay Treaty of 1794 would require that even in the face of deliberate waiver by generation after generation of heirs and successors-in-interest, a holder of property might still be stripped of title on the basis of an ancient wrong. This plainly was not the intent of Article Five, paragraph 2 of the Treaty of 1783.

There is nothing in the historical record or cases cited by RIPF that indicates the signatories to the Treaty of 1783 intended to give loyalists and British property holders more than they would have had if there had been no war. Rather, it was the intent of the United States and Great Britain to remove those state-created obstacles, targeted at loyalists and British subjects, which prevented these individuals from having a fair opportunity to present their claims for restitution.

Within the context of the period, it is clear that even after the signing of the Treaty of 1783, British subjects and heirs to dispossessed loyalists continued to be stripped of property rights. *See, e.g., Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. (7 Cranch) 379, 391–92, 3 L.Ed. 453 (1813) (invalidating confiscation by Virginia where under state statute at issue, title could not

vest until after. Treaty of 1783). In addition, such individuals were prevented from litigating their claims in American courts. Loyalists attainted under the 1779 Act of Attainder were "declared to be forever banished from this State" and upon being found in New York, would be "hereby adjudged and declared guilty of felony, and ... suffer death as in cases of felony, without benefit of clergy." Act of Attainder of Oct. 22, 1779, 1779 N.Y.Laws, 3 Sess. ch. 25 at art. 2. Furthermore, as "aliens," British subjects were not permitted to maintain suit in American courts. It was these state-created "impediments" and the continuing sequestration of loyalist and British property, which were removed by the Treaty of 1783.

Furthermore, it was the refusal of some states to comply with the Treaty of 1783 which instigated the crisis resulting in the enactment of the Jay Treaty of 1794. This treaty addressed itself toward normalizing relations between the United States and Great Britain by recognizing the right of British subjects to own property in this country and to bring their grievances to American courts. *See, e.g., Harden v. Fisher*, 14 U.S. (1 Wheat.) 139 (1816) (interpreting Article Nine of the Jay Treaty of 1794 as creating an exception for British subjects to the bar on suits by aliens). In light of these facts, it is a misconstruction of the Treaty of 1783 to argue, as RIPF attempts, that it created a privileged class of plaintiffs who are not subject to any state statute of limitations or the doctrine of laches.

We note that if it were proved that a loyalist heir was being unjustly prevented by a state from bringing his claim to court, a statute of limitations would properly be tolled during the period in which the impediment existed. *See, e.g., Hopkirk v. Bell*, 7 U.S. (3 Cranch) 272, 2 L.Ed. 497 (1806). It is, however, beyond reason to conclude that in the absence of evidence of such state-created "impediments" a plaintiff may simply disregard the statutes and doctrines which apply equally to all individuals seeking to recover land.

*Carver v. Jackson,* relied upon by RIPF, is not to the contrary. The plaintiff in *Carver* was the grantee of the children whose vested remainder in the property predated the 1779 attainder of their parents by New York's Act of Attainder of 1779. Because the parents had held a life estate in the property at the time their land was confiscated, the children's right to possession did not accrue until the death of both parents. The grantee commenced an action in ejectment in 1828, three years after the death of the surviving parent in 1825. Although forty-six years passed between the confiscation of the land in 1779 and the initiation of the suit in 1825, the grantee brought this action well within the statute of limitations once his right of possession accrued. There is no indication that *Carver* supports plaintiff's contention that any action arising out of the confiscation of loyalist land can meet no time bar.

RIPF's reliance at oral argument on the disposition of the Philipse estate is similarly misplaced. In 1912, the State of New York authorized an acquisition of title to land formerly held by Philip Philipse, which had been confiscated in the Act of Attainder of 1779. *See* Act of April 18, 1912, 1912 N.Y.Laws, ch. 509. Clearly, this Court is not bound by the decisions of New York to repurchase previously-confiscated land or by the reasons the state has for so doing. Moreover, we note that the Philipse claim has been well-documented and repeatedly pressed by that family beginning with an appeal to the Royal Commission of Enquiry established by the Crown in 1784 to hear loyalist complaints. *See* Robert A. East & Jacob Judd eds., *The Loyalist Americans* 95 App. (1975).

Finding no support for RIPF's claim that a cause of action was preserved in perpetuity by either the Treaty of 1783, or the Jay Treaty of 1794, we consider the district court's application of New York's Statute of Limitation and the doctrine of laches to bar this claim.

#### b. *Statute of Limitations*

■ In choosing an applicable statute of limitations, the district court noted that either of two statutes of limitations might be appropriate. First, third-party defendant New York argued that a claim arising out of attainder during the American Revolution is barred by an enactment of the New York State Legislature which mandated that all such claims be brought no later than five years from March 28, 1797. *See Robins Island,* 755 F.Supp. at 1193. In the alternative, SDC offered the ten-year period of limitation provided by modern New York law in actions to compel the determination of a claim to real property. *See* N.Y.Real Prop. Acts § 1501 *et seq.* (McKinney 1979); N.Y.Civ.Prac. L. & R. § 212(a) (McKinney 1990); *Downes v. Peluso,* 115 A.D.2d 454, 495 N.Y.S.2d 691, 692 (2d Dep't 1985). The district court did not resolve the issue, noting that under either statute of limitations, this claim could have accrued no later than at the death of Parker Wickham on May 22, 1785, and is therefore time-barred. *Robins Island,* 755 F.Supp. at 1191–92.

Indeed, we are unaware of any statute of limitations which would provide for a two-century old action for title and possession in real property. Accordingly, we hold that this cause of action is barred as untimely. Additionally, we find that this case is barred by the equitable doctrine of laches.

#### c. *Laches*

■ "[T]he existence of laches is a question primarily addressed to the discretion of the trial court," which must consider the "equities of the parties." *Gardner v. Panama R.R. Co.,* 342 U.S. 29, 30–31, 72 S.Ct. 12, 14, 96 L.Ed. 31 (1951) (per curiam). Generally, laches is applied where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay. *See Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 *vacated on other grounds,* 891 F.2d 401 (2d Cir.1989); *In re Centric Corp.,* 901 F.2d 1514, 1519 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 145, 112 L.Ed.2d 112 (1990). We agree with the district court's determination that although laches is traditionally an equitable defense,

the doctrine is particularly applicable to ancient land claims which do not implicate broader federal policy. *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 261–73, 105 S.Ct. 1245, 1265–72, 84 L.Ed.2d 169 (1985) (Stevens, *J.*, dissenting); *see also, id.* at 244–45, n. 16 (majority) (suggesting the application of laches to bar claims by Native Americans is inconsistent with federal policy on such claims). Since we are aware of no federal jurisprudence which precludes the application of an equitable time-bar to cases arising out of New York's Act of Attainder of 1779, we consider its application here.

In considering the reasonableness of the delay, we are not unmindful of the hostility with which such an action might have been met in the late eighteenth century. We also note, that had we then heard such a case, we may have been forced to decide whether a small delay was reasonable because of the confusion surrounding the rights of loyalist heirs during this period. However, we are not called upon to decide such a difficult question here.

It is 1992, and two centuries have passed since Joseph Parker Wickham's right to possession of the premises accrued. Yet, Joseph Parker Wickham and his heirs remained on Long Island from 1791 until the present, witnessing the reaffirmation of the Treaty of 1783 in the Jay Treaty of 1794 and the Supreme Court's highly publicized decisions sustaining the rights of British and loyalist heirs unlawfully dispossessed of their lands, but did nothing. In considering the unreasonableness of the delay, it requires no strenuous debate to conclude that two centuries is too long.

■ We next consider whether SDC was prejudiced by the delay. A defendant may suffer prejudice either because it would be inequitable, in light of a change in defendant's position, to allow plaintiff's claim to proceed or because the delay makes it difficult to garner evidence to vindicate his or her rights. *See Stone*, 873 F.2d at 625. Both types of prejudice are present here.

It is unlikely that SDC would have purchased the property had it known its title was in dispute. SDC's plans for Robins Island's use, as well as those of SDC's predecessors-in-interest, were premised on the assumption that chain of title was, for almost two hundred years, quiet and complete as recorded. This assumption was not unreasonable. There must arrive a point at which title to land is settled. Overturning a two hundred year old chain of title would result in gross prejudice to SDC and the other successors-in-interest to the remainder of Joseph Parker Wickham's confiscated estate.

Furthermore, it is impossible for SDC to obtain witnesses or marshal evidence to support its contentions that Joseph Parker Wickham relinquished his claim. SDC attempted to argue that Joseph Parker Wickham accepted a payment from the British government with the intention of releasing his claim to Robins Island and that there was no impediment to the prosecution of this claim during Joseph Parker Wickham's lifetime. Neither Joseph Parker Wickham nor anyone else alive at the time is here to support or refute these claims. Nor can anyone describe with certainty what happened to the Wickham estate in the years following the American Revolution. It can just as easily be asserted that Joseph Parker Wickham accepted 2,800 pounds sterling from Great Britain in satisfaction of a claim to the island or that he intentionally waived claim to the estate of his father than that he was unfairly prevented from maintaining a suit. In short, the enormous lapse of time makes it impossible to know whether title would have changed hands if this action had been timely brought. It is because this case turns on an interpretation of ancient and unascertainable facts that the law favors repose.

Having found unreasonable delay and prejudice, we find this cause of action in ejectment to be barred by the doctrine of laches. In applying the doctrine of laches to Wickham's claim for the recovery of Robins Island, we wish to be clear that we do not consider whether laches may apply to bar a treaty-based cause of action. Rather, it is because the Treaty of 1783 and the Jay Treaty of 1794 neither created a right to recovery nor extended indefinite-

ly any right which may have already exist-ed, that we find this action is time-barred.

Reason tells us that a claim to property long unprosecuted is lost. Whatever else we can surmise from the historical record, it is clear that even if Joseph Parker Wick-ham had a right to title in Robins Island, he and his heirs slept on this right for over two centuries. If the price of liberty is eternal vigilance, then it is little to ask that the price of property be a small portion of the same.

## CONCLUSION

We have examined each of RIPF's re-maining contentions and find them to be without merit. Accordingly, we affirm the judgment of the district court granting SDC's motion for summary judgment.