**In re Mary E. FULLER and Charles H. Groves, Bankrupts.**

Docket No. M–38.
Bankruptcy No. 3165.

United States Bankruptcy Court,
S.D. New York.

Oct. 31, 1992.

Weil, Gotshal & Manges, New York City, for Trustees of Hamilton College.

Jeffrey L. Sapir, White Plains, Trustee in Bankruptcy of Mary E. Fuller & Charles H. Groves.

Faber & Troy, Westbury, McNulty & Spiess, Riverhead, for Schmelzer.

## DECISION ON MOTION TO RECLOSE BANKRUPTCY CASE

### HOWARD SCHWARTZBERG, Bankruptcy Judge.

Pursuant to 11 U.S.C. § 350, this court permitted the resurrection of a bankruptcy case filed under the Bankruptcy Act of 1867 because it was alleged by the assignee of a creditor that reopening the case was necessary to clear title to certain property with respect to which the power of alienation had been suspended for over one hundred and twenty years.[1] The creditor assignee wanted to bid in his claim and acquire the property at a trustee's sale so as to clear title to the property, which was allegedly unadministered in the old bankruptcy case. The Trustees of Hamilton College ("Hamilton") have moved for an order re-closing the bankruptcy case because the property interests were previously administered or abandoned in the old bankruptcy case, or because of laches.

The case was reopened by order dated March 14, 1991 on the petition of George M. Schmelzer ("Schmelzer"), who acquired from Quantum Chemical Corp., the alleged successor to Bridgeport Brass Company ("Bridgeport Brass"), the latter's claim against the bankrupt, Charles H. Groves ("Groves"). On October 12, 1871, Bridgeport Brass filed an involuntary bankruptcy case in the United States District Court for the Southern District of New York against Groves. Six days later on October 18, 1871, Groves died testate, in New York County, survived by his widow, Julia Groves. Before his death, the bankrupt had inherited from his mother, Letetia Groves, daughter of Thomas J. Ellison, her one-third intestate interest on August 30, 1870. Groves devised all of his property to his wife, Julia Groves, who, promptly after his death, married William Henry Halloran. Hamilton claims its interest in the property in question from William P. Doremus, a descendant of the remarriage of Julia Groves and William Henry Halloran.

Hamilton filed a motion with this court to vacate and set aside the bankruptcy trustee's sale of the property to Schmelzer, and to determine that the property was previously administered in the 1871 bankruptcy case, either by settlement or by abandonment and to re-close the 1871 case. On March 5, 1992, this court issued an order reopening and vacating the bankruptcy trustee's sale of the property without prejudice to Hamilton's rights to seek the remainder of the relief requested in its motion. Hamilton now seeks an order reclosing the 1871 bankruptcy case on the ground that the property was previously administered in the 1871 case, either by settlement or abandonment.

### FACTUAL BACKGROUND

On October 12, 1871, Bridgeport Brass, by its attorney Samuel C. Mount, Esq.

---

1. Although the property in question in this case is located on Long Island and is within the jurisdiction of the Eastern District of New York, the Eastern District had not been established at the time this bankruptcy case was filed in 1871. Therefore, this case proceeded in the Southern District of New York. George M. Schmelzer, the party who petitioned for reopening of this case, did so by request to the Honorable Charles L. Brieant, Chief Judge of the Southern District of New York, who referred the case to this court.

("Mount"), petitioned the Honorable Samuel Blatchford, Judge of the District Court of the United States for the Southern District of New York, requesting that Mary E. Fuller ("Fuller") and Groves as co-partners of the firm of Turnbull & Co. ("Turnbull"), a manufacturer of copper pails, be adjudged bankrupts under the Bankruptcy Act of 1867, 14 Stat. 517 (the "1867 Act"). On October 16, 1871 the petition was served upon Fuller at the offices of Turnbull, and upon Julia Groves, the wife of Groves, who told the marshall that Groves was suffering from an illness and was unable to receive visitors. The petition was returnable on October 21, 1871.

On October 18, 1871, Groves died,[2] causing the scheduled hearing on Bridgeport Brass's petition to be adjourned until an executor of Groves's decedent's probate estate could be appointed. On December 4, 1871, the Surrogate of the County of New York appointed Julia Groves as Executrix of Groves's decedent's estate, and letters testamentary were issued on December 8, 1871. On December 9, 1871, District Judge Blatchford issued an order to show cause why Bridgeport Brass's petition should not be granted, and further ordered that Julia Groves, as Executrix of Groves's decedent's estate, be served with the order to show cause, and be ordered to appear on January 6, 1872 at the hearing on Bridgeport Brass's bankruptcy petition. Mount served this order to show cause on Julia Groves's last known residence and on her father, Peter C. Doremus, residing in Bayonne, New Jersey.

Mount, as attorney for Bridgeport Brass, then obtained an injunction against Julia Groves "enjoining said executrix from disposing of any such proceeds [from the sale of certain real estate by Groves immediately prior to his death] as well as any of the estate." *Affidavit of Samuel C. Mount*, at 5 (May 4, 1874) (the *"Mount Affidavit"*). Mount endeavored unsuccessfully more than six times to serve this injunction on Julia Groves, and hired two others to assist him, one of whom was "violently

assaulted by [Julia Groves's] father." *Mount Affidavit*, at 6. Mount then "sent to Mauch Chunk, Pennsylvania, Perth Amboy, and South Amboy, New Jersey, Charleston, South Carolina, and to Connecticut endeavoring to serve said injunction." *Mount Affidavit* at 6. He finally left the injunction with her father.

On January 6, 1872, the court overruled Julia Groves's answer to the involuntary petition, and determined that an adjudication of bankruptcy could be entered against a decedent's estate, whereupon the order adjudging Fuller and Groves bankrupts was entered. On January 31, 1872, the first meeting of creditors was held in the offices of Henry Wilder Allen, Esq., Register in Bankruptcy. Jonathan H. Crane and John F. Butterworth were appointed the Assignees of the bankrupt estates.

No asset listings or asset schedules were found in the official files, now housed in the National Archives. The records do, however, contain three documents which indicate that sometime in the first half of 1872 Julia Groves, as Executrix of Groves's decedent's estate, appeared to have settled all claims by Groves's creditors against his decedent's estate and his executrix, thereby releasing any claim that the creditors might have to the assets owned by Groves personally (and not by the Turnbull firm) at the time of his death. As part of this settlement with Julia Groves, as Executrix of Groves's decedent's estate (the "Settlement"), Julia Groves paid the Bankrupts' estates $2,000 for a release, representing an eleven or eleven and one-half percent dividend on all unsecured claims against such estate.

One of the documents evidencing the Settlement is an affidavit by Mount seeking attorney's fees as attorney for the petitioning creditors, for his work in the case. After reciting his extensive efforts to serve the injunction on Julia Groves, he notes

I further say that said Julia Groves afterwards paid in, *in settlement for re-*

---

**2.** As a manufacturer of copper pails, it might be said that this was the date that Groves "kicked the bucket."

*lease against said separate [decedent's] estate* about $2,000 a dividend of eleven per cent to be distributed among the creditors proving their claims herein. *Mount Affidavit*, at 6–7 (emphasis added).

Another document referring to the Settlement is an undated petition to Judge Blatchford by J.B. Hubbard (the "Hubbard Petition"), as Agent for Bridgeport Brass, the petitioning creditor, for allowances of costs and disbursements in the case. Included in its recitals of the history of the case is the following:

> That an injunction was granted on application of your petitioner restraining said administratrix [Julia Groves] from disposing of said estate.... That suits were instituted against the estate of said Charles H. Groves, which resulted in a *compromise between Mrs. Groves and the creditors* and that money was paid directly to the creditors.

*Hubbard Petition*, at 4–5 (emphasis added).

A third document referring to the Settlement is a page from what appears to be a bill to the Assignees from their attorneys, the firm of Brownell & Lathrop, dated June 2, 1872:

> To retainer & counsel fee and costs in suit in Equity Yourselves v. Robert H. Rathburn, Mary Ann Colvin, Harry E. Lord, *Julia A. Groves*, Reuben Ross Jr., Sylvester S. Post including *settlement of same by payment to creditors* of 11½ per cent of their claims....

Brownell & Lathrop bill (emphasis added).

The National Archives records also reflect that attorney Mount was, by his own admission, extremely diligent and successful in his efforts to maximize the value of the bankrupt estate. In his fee application, Mount recited at some length the various services that he provided to the bankrupt estate, including the fact that he "devoted fully twenty-five days time personally [to the pursuit of, and settlement with, Julia Groves], it occupying about half of my time." *Mount affidavit*, at 7. He concluded "nothing would have come to the creditors from the separate [decedent's] estate of Groves but for the *perseverance in [Ju-*

*lia Groves's] pursuit. Mount Affidavit*, at 8 (emphasis added).

Mount also reported other incidents involving his own diligence in marshalling the bankrupts' assets, including his discovery of two allegedly secret schemes of Groves. In one, Mount claims that there was an effort by Groves for a fraudulent conveyance of his real property, but this scheme was foiled by Mount's perseverance:

> [S]aid Groves prior to his death conveyed his property and placed the proceeds in the hands of his wife, who kept her whereabouts a matter of secret and that nothing would have come to the creditors from the separate estate of said Groves but for the perseverance in her pursuit.

*Mount Affidavit*, at 8. In another instance, involving an alleged preferential treatment of a creditor, Mount asserted:

> I verily believe that it was the prearranged plan for said Butterworth to take the said machinery under his mortgage thereon and of the other stocks fixtures and effects under his judgments on said notes and so leave nothing for other creditors, which was only defeated by the *vigilance of the petitioning creditors* herein.

*Mount Affidavit*, at 8 (emphasis added).

Another document contained in the files of the 1871 Proceeding is an order dated May 4, 1874, authorizing a first dividend to creditors of five percent. There appears to be no later orders or other documents in the official file referring to a closing or termination of the proceeding.

The title to Lots 12 and 14 derived originally from Thomas J. Ellison, whose deed was recorded in Suffolk County in 1859. Ellison owned Lots 12 and 14 in their entirety. He died testate in 1867 and devised the property to his three sisters, Letetia Groves, Jerusha Bunce and Nancy Bishop, who each received a one-third interest in Lots 12 and 14. Letetia Groves died intestate in Suffolk County on August 30, 1870, leaving her son Charles H. Groves as her only heir. As noted, Groves died testate on

October 18, 1871, devising all his property to his wife, Julia Groves.

Julia Groves remarried one William Henry Halloran, and she died testate in Elizabeth, New Jersey on December 1, 1926, leaving her residuary estate to her daughter Ida L. Halloran, who was also known as Ida L. Groves. Ida L. Halloran/Groves died testate in Jersey City, New Jersey on November 15, 1945, devising her residuary estate to her cousin, William Doremus. William Doremus died intestate in Kings County, New York, leaving his wife, Edna Doremus, and son, Doctor William P. Doremus ("Dr. Doremus"). On December 2, 1968 Edna Doremus conveyed her interest in Lots 12 and 14 to Dr. Doremus. On April 28, 1983, Dr. Doremus conveyed his interest in Lots 12 and 14 to the Trustees of Hamilton College.

The devolution of title to the remaining ⅔ interest in Lots 12 and 14 is, at the present time, unclear, and is the subject of a State Court Action. Schmelzer appears to have purchased his interest from one or more of the descendants of Jerusha Bunce and/or Nancy Bishop.

On or about February 22, 1989, Hamilton initiated an action in the Supreme Court, Suffolk County, (the "State Court Action"), against Schmelzer, his wife, Inge Schmelzer, and others to quiet title to Lots 12 and 14, or, in the alternative, to partition and sell Lots 12 and 14. On or about the same date, the Hamilton Trustees caused the filing with the County Clerk of Suffolk County of a Notice of Pendency of the State Court Action, (the "*Lis Pendens*"). Approximately six months later, counsel for the Hamilton Trustees served an amended verified complaint in the State Court Action dated August 7, 1989. Since then, the State Court Action has been actively litigated by all parties.

The Schmelzer Motion in this court was filed to reopen the 1871 proceeding for the avowed purpose of appointing a trustee in bankruptcy to administer certain allegedly unadministered property interests, to wit, the Brookhaven property in question. Schmelzer and his attorneys did not disclose that Hamilton was record owner of Lots 12 and 14 since 1983, nor did they reveal the fact that Schmelzer was engaged in active litigation with Hamilton in Suffolk County over title to the property, or that a *Lis Pendens* had been filed in respect of the Hamilton property interests.

Neither the original Schmelzer Application, the Schmelzer Affidavit, nor the Schmelzer Motion disclosed that the market value of all of Lots 12 and 14 was considerable, having been appraised at $5.9 million.

At the hearing on February 20, 1992 on the Motion to Vacate, this court learned that Schmelzer and his attorneys had failed to follow its directive to notify all the heirs of Julia Groves as to the reopening of this case. This court then vacated the sale of the property in question to Schmelzer, and further ordered that Hamilton was entitled, without prejudice, to seek the relief that it now requests.

### DISCUSSION

The skeleton of this bare bones case filed under the 1867 Bankruptcy Act might not have been exhumed but for the fact that the corpus now has a potential value of over $5 million dollars. Initially, the court is confronted with the question as to whether it has jurisdiction to entertain matters related to the Bankruptcy Act of 1867 which was repealed by Congress in 1877. *See* 20 Stat. 99. There was a gap of over twenty years before the next bankruptcy act was adopted in 1898. However, 11 U.S.C. § 350(b) provides as follows:

**§ 350. Closing and reopening cases.**

(a) After an estate is fully administered and the court has discharged the trustee, the court shall close the case.

(b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

The word "case" is not limited to cases closed under any specific Bankruptcy Act. The critical factor is the identification of the court in which the case was closed. Therefore, a case which was closed under any previous Bankruptcy Act in the United States District Court for the Southern Dis-

trict of New York may be reopened in the same court to administer assets or for cause, including according relief to the debtor. 11 U.S.C. § 350. Therefore, a case that is reopened in this court pursuant to 11 U.S.C. § 350 constitutes a civil proceeding arising under title 11 within the meaning of the jurisdictional grant in 28 U.S.C. § 1334(b). In view of the fact that this court has jurisdiction to reopen a case closed under the 1867 Bankruptcy Act, it follows that it also has jurisdiction to determine whether or not certain assets in this reopened case were fully administered, either by settlement or by abandonment or that the reopened case should be closed because the sands of time have buried any traceable rights that parties living today may have derived from the corpus of this ancient estate.

One of the most important items that has been hidden by the cobwebs surrounding this case is the absence of asset schedules in the official files or the National Archives. Consequently, it is impossible to ascertain if the property in question was ever included in Groves's bankruptcy estate or subject to the administration of the court. There are documents referring to a settlement with creditors and a distribution to them. However, there is nothing in the file to reflect that anyone involved in the administration of the Groves bankruptcy estate was aware of the existence of the property in question. The only ascertainable creditor of this estate was Bridgeport Brass, which apparently has disappeared in favor of Quantum Chemical Corp., which in turn has sold any claim it might have against this estate to the respondent, Schmelzer. Neither the movant, Hamilton, nor the respondent, Schmelzer, has any first hand knowledge as to the administration of this case before it was closed.

The petition to reopen this case was bottomed on the assertion that the state of the record was such as to create a cloud upon the title to property which Schmelzer acquired from heirs of Groves's mother. He apparently owns two-thirds of a tract of land in Brookhaven, Long Island, New York, which he acquired from heirs of Groves's mother, but the one-third interest which Groves inherited from his mother interferes with his ownership of the other two-thirds interest. Therefore, Schmelzer purchased the petitioning creditor's claim from a successor corporation and seeks to bid in his claim in order to acquire title to the entire tract. However, he never advised this court that he had pending litigation with Hamilton in the state court in Suffolk County, New York, with respect to the issue of title as to the property in question. Manifestly, the issue of title to this property could be timely adjudicated in the state forum without need for reopening this bankruptcy case.

At issue is a *corpus delecti* and too many missing parts to conjur up even a skeleton estate. First, the petitioning creditor of the bankrupt partnership of which Groves was a partner, Bridgeport Brass, does not presently exist. There was no evidence produced that Quantum Chemical Corp., the entity from which Schmelzer purchased his claim, ever had a valid outstanding claim against the bankruptcy partnership or Groves which could be assigned to Schmelzer. Second, there was no proof as to which property was administered by the representatives of the bankrupt estate because there is no list of assets or schedules available in the files of the bankrupt estate. Although there was some reference in the papers to a settlement between the creditors and Groves's widow, Julia, resulting in a distribution of approximately eleven percent, there was no document reflecting either the details of the settlement or the precise distribution. Third, this dispute does not involve any direct creditors of either Groves or his partnership. Schmelzer is a purchaser of an alleged claim from Quantum Chemical Corp. which he acquired in order to invoke the jurisdiction of this court after having been involved in a state court litigation with Hamilton concerning title to the property in question. Fourth, Hamilton does not claim title to the property through any of Groves's heirs. Hamilton traces its title back to heirs of Groves's widow, Julia, and her second husband. Fifth, there is no proof that there are any other existing creditors or parties

in interest who would either benefit or be affected differently by a resolution of the title dispute in the bankruptcy court rather than in the pending state court action.

▮ The issues of abandonment and settlement were raised by Hamilton as a basis for re-closing this case. Under the Bankruptcy Code as it is applied today, property is not deemed abandoned by operation of law merely because the trustee failed to administer it, unless the property was formally scheduled before the case was closed. *Vreugdenhill v. Navistar International Transportation Corp.*, 950 F.2d 524 (8th Cir.1991); *Schwaber v. Reed (In re Reed)*, 940 F.2d 1317 (9th Cir.1991). This is so even if the trustee actually knew of the property's existence when the case was closed. However, in the instant case, the court is unable to address the issue of abandonment because there is no proof that the property ever came into the bankruptcy case or that the representatives of the estate ever attempted to include the property either in the administration of the estate or as a result of an alleged settlement with Groves's widow.

▮ Although the Bankruptcy Code provides no time limit for an application to reopen an estate, such reopening should be conditioned upon a showing that the public interest and the purpose of the Bankruptcy Code would be served by further administration of the estate. *Hull v. Powell*, 309 F.2d 3 (9th Cir.1962). It is questionable whether a desire to clear title is a sufficient ground to reopen a bankruptcy case. *See Saper v. Viviani*, 226 F.2d 608, 610 (2d Cir.1955) ("[T]he real source of trouble is in the sudden coming to life of a proceeding dead for nineteen years."). Significantly, Schmelzer has an alternative remedy in the state which he pursued and which is still pending. Therefore, there appears to be little justification for invoking this court's jurisdiction to resolve his clouded title problem. Further administration in this court as to title to property allegedly under a cloud for over one hundred twenty years creates a risk that the estate might succeed at the price of injustice to adverse parties. *Hull*, 309 F.2d at 6 (attempt to reopen based on a cloud on title for twenty-three years).

In a strikingly similar case, a challenge to New York State's seizure two hundred twenty-two years ago of an island off Long Island, New York from a British sympathizer during the American Revolutionary War was rejected by the Second Circuit on the theory that two centuries' delay was sufficient to bar a title claim because of laches and public policy. *Robins Island Preservation Fund, Inc. v. Southold Development Corp.*, 959 F.2d 409 (2d Cir. 1992), *petition for cert. filed*, (U.S. Oct. 7, 1992) (No. 92–622). The estate had been confiscated pursuant to the Act of Attainder of 1779 which stripped the British sympathizer of title to his property in New York. The court ruled that laches is applied when a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay. *Id.* at 423. The Second Circuit concluded that the doctrine of laches is particularly applicable to ancient land claims which do not implicate broader federal policy. *Id.* at 424.

In the instant case, the only known creditor, Bridgeport Brass, and its successors in interest, including Schmelzer, have had over one hundred twenty years to assert a creditor's claim, but did nothing. In considering the unreasonableness of the delay, it must be concluded in the interest of fairness and equity that an entombment of one hundred twenty years should not be disturbed. This court grants Hamilton's motion to reinter this exhumed corpus and will allow the parties to continue their litigation as to title to the property in question in the state court where their litigation is pending. The motion to re-close this case under the Bankruptcy Act of 1867 is granted and may the bankruptcy case rest in peace.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and 11 U.S.C. § 350(b). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A).

2. Hamilton's motion to re-close this case which was reopened under the Bankruptcy Act of 1867 is granted on the grounds of laches.

SETTLE ORDER on notice in accordance with the foregoing.